**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROSHAUNDA HANDFORD, ex rel.,** ) | |
| **I.H., a minor,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 12 C 9173** |
| ) | |
| **CAROLYN W. COLVIN,**[1] ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Roshaunda Handford is seeking to recover Supplemental Security Income ("SSI") on behalf of her minor son, I.H., under Title IX of the Social Security Act. 42 U.S.C. § 1382c(a)(3)(C). The Commissioner of Social Security ("Commissioner" or "Defendant") denied the application for benefits at all levels of administrative review, prompting this appeal. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff now seeks summary judgment in her favor. After careful review of the record, the Court grants Plaintiff's motion and remands the case for further proceedings.

**PROCEDURAL HISTORY**

Plaintiff applied for SSI on October 5, 2009, alleging that her nearly 7-year-old son I.H. had been disabled since March 1, 2009 due to attention deficit hyperactivity disorder ("ADHD"). (R. 106, 136, 140). The Social Security Administration ("SSA") denied the application initially on February 16, 2010, and again on reconsideration on

---

[1] Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

June 4, 2010. (R. 52-62). Plaintiff filed a timely request for hearing, and on July 27, 2011, she and I.H. both appeared before Administrative Law Judge Janice M. Bruning (the "ALJ") and offered testimony in the presence of a non-attorney representative. (R. 17, 31). Shortly thereafter, on September 22, 2011, the ALJ found that I.H. is not disabled because he does not have an impairment or combination of impairments that functionally equals the relevant listings. (R. 17-26). The Appeals Council denied Plaintiff's request for review on October 3, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for a remand, Plaintiff argues that the ALJ (1) failed to explain why I.H. does not meet or equal Listings 112.04 and 112.11[2] relating to mood disorders and ADHD; (2) ignored and/or improperly weighed opinion evidence and other medical findings; (3) failed to fully and fairly develop the record; and (4) used improper boilerplate language in making her credibility determination. As discussed below, the Court finds that the ALJ did not properly weigh the opinion evidence in this case, requiring a remand.

## FACTUAL BACKGROUND

I.H. was born on November 8, 2002 and was nearly 9 years old on the date of the ALJ's decision. (R. 106). He lives with his mother and two older brothers, and attends CICS Basil, a Chicago charter school. (R. 175, 248).

---

[2] Plaintiff's citation to Listing 12.06 for anxiety disorders appears to be in error.

A.     **Medical History**

  1.     **2008 – Age 5 to 6**

  On August 28, 2008, I.H. started therapy sessions with Julianna Wesolowski, LPC, of Family Focus, with the goal of decreasing his disruptive behaviors at preschool and increasing his capacity for self-regulation.  (R. 309).  Over the course of the next 9 months, he attended 11 individual and 7 family sessions, and Ms. Wesolowski "collaborated frequently with his teacher and other school staff, and attended school meetings regarding problem behaviors and resultant interventions within the school setting." (*Id.*).  Ms. Wesolowski last saw I.H. on June 5, 2009, but her one-page letter report dated December 7, 2009 does not indicate whether he achieved his goals, or document his progress throughout the treatment period.  (*Id.*).

  1.     **2009 – Age 6 to 7**

  In early 2009, 6-year-old I.H. was referred to his school psychologist, Jennifer Harte, M.S., M.A., Ed.S., due to "significant concerns on behalf of his teacher and support staff about his behavior."  (R. 156).  Ms. Harte saw I.H. on January 26, February 2 and February 9, 2009, and prepared a Psychological Evaluation Report of her findings.  (R. 156-60).  She explained that though I.H.'s pre-kindergarten teacher believed his behavior was manageable, his problems had escalated in kindergarten, necessitating a Full Case Study Evaluation.  (R. 156).  The school attempted several interventions, including a shortened day, scheduled breaks, incentive plans, and one-to-one assistance, but none of these reduced I.H.'s daily behavioral outbursts.  (R. 160).  Ms. Harte found I.H. to have low average to average intellectual ability, with academic skills falling within grade level expectations.  She recommended that the Individualized

Education Program ("IEP") team consider placing him in a smaller, more structured environment with a lower teacher to student ratio, and assigning him a "one to one aide" to help teach and model anger management skills. (*Id.*).

On February 10, 2009, Susan Currie, L.C.S.W., prepared an Initial Assessment of I.H. for his school. (R. 162-64). She said that since starting kindergarten, he was "extremely oppositional, deviant, aggressive with staff and peers and . . . unable to follow class routine." Ms. Currie described I.H. as "very impulsive" and noted that he had punched his teacher and was constantly leaving the classroom without permission. (R. 164). He also required constant supervision and was physically restrained almost daily, and Ms. Currie stated that a Multi Disciplinary Team needed to consult on the case to determine "how to best meet [I.H.'s] needs." (*Id.*).

On March 12, 2009, Ms. Harte issued I.H. an Entrance Form for Direct Psychological Services to address his "significant difficulties managing his temper, his oppositionality, and his aggression." (R. 161). Ms. Harte indicated that I.H. exhibited a significantly low frustration tolerance level, had significant emotional and/or learning style behaviors that prevented his receiving services in the least restrictive environment, had significant difficulty with anger management skills, and posed a threat to himself or others. (*Id.*).

Three days later, on March 16, 2009, I.H. was placed in a partial hospitalization program at Hartgrove Hospital after being suspended from school for a week because he disrupted class and exhibited aggressive behaviors. (R. 250, 260). David Benson, M.D., described I.H. as significantly obese (height 45", weight 105) with a friendly and cooperative attitude. (R. 250, 254). His behavior was compliant, his speech was

responsive, his affect was bright and full in range, his mood was euthymic, his thought processes were logical, and his content was appropriate, but his concentration was impaired at times.  (R. 250).  Dr. Benson diagnosed ADHD and obesity with a fair prognosis. (R. 251).  By March 22, 2009, I.H. was not responding to encouragement or redirection from Hartgrove staff and became very agitated at times.  (R. 248).  He was subsequently admitted to a more structured inpatient program on March 23, 2009 after fighting with staff members and head-butting one of them.  (R. 249, 271).  Dr. Benson noted that I.H. had been suspended from school almost weekly for a similar history of "fighting and acting impulsively," and assigned him a Global Assessment of Functioning ("GAF") score of 55.[3]  (R. 247, 271).

Upon his admission, I.H. was diagnosed with intermittent explosive disorder, rule-out bipolar disorder, ADHD and obesity, with a guarded prognosis. (R. 272).  He started taking Adderall and Geodon but was not following directions, refused to participate in any activities, threatened to spit on staff members, and threatened to stab one of them with a pencil if he did not get his way. (R. 265).  He ultimately became "somewhat more controllable" and was "more redirectable" despite his continued oppositional and impulsive behavior.  (R. 266).  I.H. was discharged from the hospital on April 7, 2009 with a GAF score of 50.[4]  (R. 264).

---

[3]　　 "The GAF scale reflects a clinician's assessment of an individual's symptom severity or level of social, occupational, or school functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000). . . . A GAF score of 51 to 60 means some moderate symptoms or moderate difficulty in functioning." *Thomas v. Astrue*, No. 11 C 3055, 2012 WL 359731, at *1 (C.D. Ill. Feb. 2, 2012).

[4]　　 A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Jelinek v. Astrue*, 662 F.3d 805, 808 n.1 (7th Cir. 2011).

In the meantime, on March 24, 2009, Plaintiff contacted the Ada S. McKinley Community Services Intervention Services program ("McKinley") requesting that they help monitor I.H.'s medications. (R. 281-82). On April 18, 2009, shortly after I.H.'s discharge from Hartgrove, Plaintiff took her son to McKinley for an initial assessment. (R. 287-96). Monique Bodley, LPHA, recited his history of aggressive behavior and hospitalization, and recommended outpatient counseling for both I.H. and his family once or twice a week, medication monitoring, psychiatric evaluation, case management, and community support. (R. 296). Ms. Bodley assessed I.H. with adjustment disorder with disturbance of conduct, and estimated his GAF score to be 55. (R. 297).

I.H. saw McKinley psychiatrist Oscar Munoz, M.D., on May 15, 2009, because his medications were making him sleepy and causing encopresis (soiling of underwear with stool). (R. 283-84). Dr. Munoz discontinued I.H.'s Adderall and Geodon and started him on Risperidone instead. (R. 285). By June 10, 2009, however, I.H. was back on Adderall and was "much less impulsive/hyper/disruptive" at school with no more encopresis. (R. 279). The following month, on July 24, 2009, Plaintiff informed McKinley that I.H. no longer needed therapy and she would only bring him in for medication management. (R. 381). A little more than two months later, on October 5, 2009, Plaintiff applied for disability benefits on behalf of her son. I.H. turned 7 years old on November 8, 2009, and Plaintiff took him off all medications around that time because they either "didn't seem to be doing anything" or made him "practically comatose." (R. 311).

On November 23, 2009, I.H.'s Special Education Teacher, Cristina Caponigri, completed a Teacher Questionnaire at the request of the Bureau of Disability

Determination Services ("DDS"). (R. 148-55). She said that she had known I.H. for 1 1/2 years, spending 7 hours a day with him for 4 months, and that he demonstrated reading, math and writing skills at the appropriate first grade level. (R. 148). Ms. Caponigri identified no problems with I.H.'s ability to acquire and use information, (R. 149), or move about and manipulate objects. (R. 152). With respect to attending and completing tasks, I.H. had a slight problem doing the following: paying attention when spoken to directly; completing class/homework assignments; and working at a reasonable pace/finishing on time. (R. 150). At the same time, he exhibited obvious problems with: sustaining attention during play/sports activities; focusing long enough to finish an assigned activity or task; refocusing to task when necessary; carrying out multi-step instructions; waiting to take turns; changing from one activity to another without being disruptive; and working without distracting himself or others. (*Id.*). Ms. Caponigri explained that I.H. worked with an aide in a self-contained classroom but was "still having a very difficult time completing tasks on a day to day basis." (*Id.*).

Ms. Caponigri next considered I.H.'s ability to interact and relate with others, finding him to have a slight problem: playing cooperatively with other children; making and keeping friends; and relating experiences and telling stories. (R. 151). I.H. had an obvious problem with seeking attention appropriately and asking permission appropriately, and he had a serious problem expressing anger appropriately, following rules, and respecting/obeying adults in authority. (*Id.*). I.H. exhibited no problem, however, with: using language appropriate to the situation and listener; introducing and maintaining relevant and appropriate topics of conversation; taking turns in conversation; interpreting the meaning of facial expression, body language, hints and

sarcasm; and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation.  (*Id.*).  Ms. Caponigri noted that I.H. needed to be restrained 1 to 2 times per day in the self-contained classroom because he "gets very angry when he doesn't get his way."  In her view, he functioned best when working one-on-one with the teacher or aide, and also "[e]njoys hands-on cooperative learning." (*Id.*).

Turning to I.H.'s ability to care for himself, Ms. Caponigri indicated that he had a serious problem handling frustration appropriately and using appropriate coping skills to meet daily demands of the school environment.  (R. 153).  He had an obvious problem being patient when necessary and responding appropriately to changes in his own mood, as well as a slight problem taking care of his personal hygiene and knowing when to ask for help.  I.H. demonstrated no problem, however, with: caring for his physical needs; cooperating in, or being responsible for, taking needed medications; using good judgment regarding personal safety and dangerous circumstances; and identifying and appropriately asserting emotional needs.  (*Id.*).  Ms. Caponigri observed that I.H. recognized his "need for assistance in toileting on a day to day basis," (*id.*), and finally noted that he did not miss school frequently due to illness.  (R. 154).  Though it appears that Plaintiff had taken I.H. off his medications in early November 2009, Ms. Caponigri believed that he was still taking Adderall and Geodon to help control his behavior.  (*Id.*).

On December 10, 2009, Plaintiff took I.H. to the Friend Family Health Center ("Friend Center") due to encopresis and impacted stools.  Joyce Smith, M.D., prescribed Miralax and instructed I.H. to return in two weeks.  (R. 367-68).  At that follow-up visit on

December 24, 2009, Plaintiff reported that the Miralax had not helped with I.H.'s constipation and he had lost 25 pounds. Dr. Smith prescribed Fleets enemas. (R. 365-66).

### 3.  2010 – Age 7 to 8

On January 20, 2010, Harley G. Rubens, M.D., conducted a Psychiatric Evaluation of I.H. for DDS. (R. 311-14). During the examination, I.H. was constantly moving, leaning on his mother and tipping the chair over. Plaintiff had a note from school indicating that I.H. had been sent home the previous day for "punching a child in the face who was using the computer because he wanted to use the computer." (R. 311). Plaintiff told Dr. Rubens that I.H. did not follow directions at school, lost attention, walked around the class, and tried to leave the class or jump on his desk. He had been in a self-contained classroom for more than two years at that time. (*Id.*). Dr. Rubens found that I.H.'s "[a]ttention and concentration were poor throughout the exam and he needed to be distracted from talking to his mother, staring around the room, tipping his chair, etc." (R. 313). Dr. Rubens diagnosed ADHD and intermittent explosive disorder with a GAF of 55 for the past year. (*Id.*).

A week later, on January 27, 2010, I.H. returned to the Friend Center with continued constipation and encopresis. (R. 362). I.H. had not soiled his pants at school, but he now exhibited a "phobia of toilet overflow[ing]," which "may contribute to stool retention." (R. 362-63). Dr. Smith once again prescribed Miralax and Fleets enemas. (R. 363).

Shortly thereafter, on February 11, 2010, Leon Jackson, Ph.D., completed a Childhood Disability Evaluation Form for DDS. (R. 315-20). Dr. Jackson found I.H. to

have less than marked limitations in the domains of acquiring and using information and caring for yourself, and no limitations in the domains of moving about and manipulating objects, and health and physical well-being.  (R. 317-18).  I.H. also demonstrated less than marked limitations in attending and completing tasks.  Though he exhibited "an obvious problem" focusing long enough to finish an activity, refocusing to task, carrying out multi-step instructions, waiting his turn, changing from one activity to another, and working without distracting himself or others, I.H. had no problems at home except that he failed to complete his chores.  (R. 317).  With respect to interacting and relating with others, Dr. Jackson found I.H. to have marked limitations, explaining that he had a very serious problem expressing his anger appropriately, following rules, and respecting/obeying adults.  He was restrained one to two times per day in the self-contained classroom, he became very angry when he did not get his way, and he was hyperactive and difficult to deal with as a result of being easily distracted with a tendency to try and wander off.  At the same time, I.H. had friends, generally got along with parents, teachers and other adults and played team sports.  (*Id.*).  Based on this assessment, Dr. Jackson concluded that I.H. does not have an impairment or combination of impairments that meets or equals a Listing.  (R. 315, 320).

On February 17, 2010, I.H. started seeing Karen Taylor-Crawford, M.D., at the University of Illinois Medical Center at Chicago ("UIC") due to complaints of disruptive behavior at school.  I.H.'s mother and Ms. Caponigri attended the first session and reported that I.H. had "frequent angry outbursts at school, usually towards objects but at times peers or teachers will get in the way."  When the outbursts occurred, I.H. was physically restrained and removed from the classroom.  (R. 347, 443).  Plaintiff said that

I.H. had not been taking his Adderall or Geodon "for the last few months" because he lost 15 to 20 pounds while on the former (current height 61 1/2", weight 127.8) and slept excessively while on the latter.  (*Id.*).  She reported "little difficulty at home" and said he was sleeping well.  (*Id.*).  I.H. admitted getting easily irritated by his peers and sometimes intervening with them when the teacher did not respond to his complaints. (*Id.*).  Dr. Taylor-Crawford diagnosed I.H. with mood disorder and rule-out ADHD, assigned him a score of 35 on the Children Global Assessment Scale ("CGAS"),[5] and prescribed him Abilify to help with mood instability.  (R. 347-48).

The next day, on February 18, 2010, Dr. Smith reported that I.H.'s constipation and encopresis were improving, and there was no pathology behind his weight loss, which "may be related to Adderall."  (R. 361).  I.H. saw Dr. Taylor-Crawford again on February 27, 2010, this time for group therapy with his mother and two older brothers. (R. 343-44).  In the child group session, I.H. was "very active and talkative," though he often had difficulty waiting his turn before speaking, was distractible, and engaged in "negative attention seeking behaviors."  (R. 344).  With his family, I.H. was quiet and exhibited no outbursts or inappropriate behaviors.  (*Id.*).  Dr. Taylor-Crawford assigned I.H. a CGAS score of 35 and continued him on Abilify.  (*Id.*).

---

[5]     The CGAS is "a precursor to the GAF scale and is used for children eighteen and under."  *Vargas ex rel. B.L.D.T.V. v. Colvin*, No. Civ. A. 12-03317, 2013 WL 6231267, at *4 n.12 (E.D. Pa. Dec. 2, 2013).  A CGAS score between 31 and 40 represents "[m]ajor impairment of functioning in several areas and unable to function in one of these areas i.e., disturbed at home, at school, with peers, or in society at large e.g. persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent; such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category)."  *Krebs v. Astrue*, No. CV-11-3084-LRS, 2012 WL 6546890, at *5 n.4 (E.D. Wash. Dec. 14, 2012).

On April 14, 2010, I.H. went back to see Dr. Taylor-Crawford for medication management. (R. 340). The Abilify was helping at that time, as I.H. was waiting his turn before speaking and getting along better with other children at school. Dr. Taylor-Crawford added Focalin to I.H.'s medication regimen for ADHD symptoms and increased his CGAS score to 40. (R. 341). The following month, on May 5, 2010, I.H. and his family had a therapy session with Jackson Goodnight, a psychiatry student working with Dr. Taylor-Crawford. (R. 506-10). I.H. was cooperative and polite throughout the session and made appropriate eye contact with Mr. Goodnight. He also spoke in a normal tone, with appropriate rhythm and rate. (R. 507). Mr. Goodnight noted that I.H. was attending school regularly, but that Plaintiff did receive calls about his behavior. (R. 508).

When I.H. returned to Dr. Taylor-Crawford for medication management on May 12, 2010, he was still waiting his turn before speaking and getting along better with other children at school "with meds." (R. 337-38). He had difficulty on the playground at times, however, and had to be taken to the dean's office "kicking & screaming." (R. 338). Dr. Taylor-Crawford kept I.H.'s CGAS score at 40. (*Id.*). During a family therapy session with Mr. Goodnight the same day, I.H. remained cooperative and polite with appropriate eye contact and normal tone. (R. 498-99). He was attending school regularly and had no reported problems since the last session. (R. 500).

The next day, on May 13, 2010, I.H.'s Case Manager, Jennifer Roesch, completed a Teacher Questionnaire for DDS. (R. 175-82). Ms. Roesch indicated that she had been seeing I.H. for 7 hours per day over the previous 8 months, and that his reading, writing and math skills were all at the appropriate first grade level. (R. 175).

Once again, I.H. had no problems acquiring and using information, (R. 176), or moving about and manipulating objects. (R. 179). In the domain of attending and completing tasks, I.H. demonstrated a slight problem with: paying attention when spoken to directly; focusing long enough to finish an assigned activity or task; completing work accurately without careless mistakes; and working at a reasonable pace/finishing on time. (R. 177). He also had an obvious problem with: sustaining attention during play/sports activities; refocusing to task when necessary; carrying out multi-step instructions; waiting to take turns; changing from one activity to another without being disruptive; and working without distracting himself or others. (*Id.*). Ms. Roesch indicated that since I.H. started taking medication, however, he "rarely needs assistance" from his one-on-one aide and only works with him about 2 times per week. (R. 177, 181).

The domain of interacting and relating with others remained a big problem for I.H., as he demonstrated a very serious problem with: expressing anger appropriately; following rules; and respecting/obeying adults in authority. (R. 178). He also had an obvious problem with seeking attention appropriately and asking permission appropriately, and a slight problem with playing cooperatively with other children, making and keeping friends, and relating experiences and telling stories. (*Id.*). Ms. Roesch noted that I.H. had to be restrained 1 to 2 times per week in the self-contained classroom because he "gets very angry when he doesn't get his way." (*Id.*). In a similar vein, I.H. had a serious problem handling frustration appropriately; and an obvious problem being patient when necessary. (R. 180). Ms. Roesch further reported hourly problems with: responding appropriately to changes in his own mood; using appropriate

coping skills to meet the daily demands of the school environment; and knowing when to ask for help. (*Id.*).

I.H. and his family had another therapy session with Mr. Goodnight on May 19, 2010. (R. 493-97). I.H. was cooperative and polite, and there still had been no reported problems at school. (R. 494-95). The same was true at the next two sessions on May 26 and June 2, 2010. (R. 483-85, 488-90). Also on June 2, 2010, Donald Henson, Ph.D., completed a Childhood Disability Evaluation Form of I.H. for DDS. (R. 349-54). Like Dr. Jackson, Dr. Henson found I.H. to have less than marked limitations in the domains of acquiring and using information and caring for yourself, and no limitations in the domains of moving about and manipulating objects, and health and physical well-being. (R. 351-52). Dr. Henson noted that I.H.'s academic skills fell within grade level expectations and his teachers reported no problems with understanding and comprehension. Recent notes from Dr. Taylor-Crawford also reflected "improvement in school and at home with medication." (R. 351). Medication also helped improve I.H.'s obvious problem being patient when necessary and responding appropriately to changes in his own mood. (R. 352).

In the domain of attending and completing tasks, Dr. Henson found I.H. to have less than marked limitations, noting again that recent psychiatric reports from Dr. Taylor-Crawford showed that he was "taking his turn to speak in [the] classroom and with medication he has shown improvement." (R. 351). Dr. Henson finally agreed with Dr. Jackson that I.H. has marked limitations in the domain of interacting and relating with others. (*Id.*). Reports indicated that he exhibited a very serious problem expressing his anger appropriately, following rules, and respecting/obeying adults, and

was restrained 1 to 2 times per day in the self-contained classroom. He also became very angry when he did not get his way, and he was hyperactive and difficult to deal with as a result of being easily distracted with a tendency to try and wander off. At the same time, I.H. had friends, generally got along with parents, teachers and other adults, and played team sports. (*Id.*). Based on this assessment, Dr. Henson concluded that I.H. does not have an impairment or combination of impairments that meets or equals a Listing. (R. 349, 354).

On June 17, 2010, I.H. received an IEP Report Card from Ms. Caponigri documenting his progress. (R. 224). I.H. met all of his stated academic goals, and was "practicing taking turns when working in small groups." His explosions were less frequent, but Ms. Caponigri stated that he was "still having very angry outbursts throughout the day," with some days being better than others. (R. 225). Approximately one week later, on June 23, 2010, I.H. saw Dr. Taylor-Crawford for further medication management. (R. 457-59). He had finished first grade and his teachers reportedly "felt he continued to have difficulty on the playground at times with anger, but no physical outbursts." (R. 458). Dr. Taylor-Crawford instructed Plaintiff to continue giving I.H. Abilify and Focalin and return in two months. (R. 459).

When I.H. went back to the Friend Center on July 21, 2010, he had gained 23 pounds but had no more encopresis. (R. 356). At a medication management session on August 25, 2010, Dr. Taylor-Crawford noted that I.H. had started second grade and was spending more time in the regular class. (R. 454-55). He was not having difficulty on the playground and there had been no reported physical outbursts, but his CGAS score remained 40. (R. 455). I.H. next saw Dr. Taylor-Crawford on October 13, 2010

for further medication management. (R. 451-53). He was still spending more time in the regular class, but he was having some difficulty resisting taunts from other kids after lunch. This resulted in him "yelling & screaming (threw a chair, refused to do his work, & talking back to the teacher)." (R. 452). He had not had a physical outburst in the prior two weeks, however, and Dr. Taylor-Crawford kept his CGAS score at 40. (*Id.*).

On December 8, 2010, Dr. Taylor-Crawford completed a Child Psychiatry Note setting forth her course of treatment with I.H. since February 17, 2010. (R. 442-47). She indicated that with therapy and medication, I.H.'s behavior and concentration had improved both at home and at school, and he had been moved out of special education into a regular education program with support from the school social worker and a reading specialist. (R. 444). Dr. Taylor-Crawford described I.H. as cooperative but fidgety, and found him otherwise normal. (R. 444-46). She stated that she would no longer be treating I.H. because he was going to start a "bipolar study," and thus closed his case. (R. 448-50).

### 4. 2011 – Age 8 to 9

The following month, on January 31, 2011, 8-year-old I.H. started treating with Huma Abbas, M.D., at UIC. (R. 472-77). Plaintiff told Dr. Abbas that I.H. was "losing control" at school, getting angry very easily and "blow[ing] up and explod[ing]" when things did not go his way. (R. 474). He used to get physical, kicking and hitting, but now the outbursts were mostly verbal, consisting of screaming and yelling. I.H. was spending most of his time in a self-contained classroom, and he described his own mood as mostly "angry," which he attributed to the fact that a boy in his class "annoys me, calls me names and touches [my shoulder]." (*Id.*). Dr. Abbas noted that I.H. was

overweight with good grooming and hygiene, and he answered questions politely despite being a little distracted. (*Id.*). His speech, awareness level, cognitive functioning, mood, affect and thoughts were all normal, and Dr. Abbas decided not to alter his medications at that time. (R. 475-77).

On February 17, 2011, I.H. started working with Joelle Kezlarian, M.D., at UIC to help with anger management. (R. 466-67). He told Dr. Kezlarian that he gets angry and physically aggressive when people tease him, call him names or tell him to do something. Most of this behavior (90%) occurs at school, and the staff "does a good job of managing his anger and . . . deescalat[ing] the situation" by threatening to call his mother or restraining him. (R. 468). Dr. Kezlarian diagnosed I.H. with bipolar disorder and ADHD, and noted that he was overweight with a CGAS score of 50.[6] (R. 467). She described him as restless and fidgety during the examination, with tangential thought process and impairments in his social interactions and personal judgment. (R. 469). At a second appointment with Dr. Kezlarian on February 23, 2011, Plaintiff reported that I.H. had only had one outburst at school the previous week, and I.H. agreed he "had a good week overall." (R. 462-63). Dr. Kezlarian's assessment remained unchanged. (R. 463-64).

I.H.'s next appointment was with Dr. Abbas on March 2, 2011. (R. 431-37). He said that his mood was "okay" at that time but he had been mostly angry. (R. 432-33). Neither I.H. nor his mother could identify his triggers. Plaintiff stated that I.H.'s behavior

---

[6]     A CGAS score of between 41 and 50 reflects "[m]oderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent anxiety attacks, poor or inappropriate social skills, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships." *Krebs*, 2012 WL 6546890, at *5.

was more aggressive at school, and she "gets notes from the school every day . . . that he hit someone or refused to do his work." (R. 433). On examination, Dr. Abbas observed that I.H. was sitting down and answering questions politely. (*Id.*). His speech, motor activity, awareness level, cognitive functioning, mood, affect, thought process and content, social interactions, insight and judgment were all normal. (R. 433-35). Though he was able to focus and concentrate better with Focalin, his mood had not improved with Abilify so Dr. Abbas increased the dosage. (R. 433, 436).

Later that month, on or about March 25, 2011, Plaintiff's attorney received an undated form from Dr. Abbas stating that she had been treating I.H. since January 31, 2011 for bipolar disorder and ADHD, and that he was attending weekly therapy sessions at UIC, with monthly medication monitoring. (R. 378, 380). According to Dr. Abbas, I.H. has no limitation in acquiring and using information, moving about and manipulating objections, or caring for yourself. (R. 378-79). He is markedly limited in attending and completing tasks, however, since he loses focus and attention, and is "distractible, hyperactive and impulsive." (R. 378). He is also markedly limited in interacting and relating with others given his aggressive and defiant behavior and daily meltdowns. Dr. Abbas noted that I.H. kicks, throws things, screams, yells and is "mostly irritable and angry." (R. 379). In the domain of health and physical well-being, Dr. Abbas described I.H. as markedly limited because he is "overweight." (R. 380).

Dr. Kezlarian's March 30, 2011 assessment of I.H. was unchanged from the previous February 23, 2011 visit. (R. 423-27). Plaintiff reported that her son had had a "good week at school with no behavioral outbursts and none at home." (R. 424). I.H. described having a similarly "good week" when he saw Dr. Kezlarian on April 6, 2011.

(R. 418-19). Plaintiff said that I.H. received one detention for kicking a table, but "overall his behavior continues to improve." (R. 419). The last available treatment note is from Dr. Abbas, who also saw I.H. on April 6, 2011. (R. 411-16). I.H. told Dr. Abbas that his mood was "good" and Plaintiff agreed that there had been a "significant improvement in his mood since the dose of Abilify was increased." (R. 412). I.H. was not angry or aggressive, his behavior at school had "changed for the better," he was mostly able to calm himself down when he got upset, he had "more good days," and his teachers were "not calling mom." (R. 412-13).

## B.        Plaintiff's Testimony

On October 5, 2009, Plaintiff completed a "Function Report – Child Age 6 to 12th Birthday" on behalf of I.H. in connection with his application for disability benefits. (R. 126-34). She indicated that I.H. can engage in all forms of communication, including delivering telephone messages, repeating stories he has heard, telling jokes accurately, explaining why he did something, and talking with friends and family. (R. 129). The only learning-related activities I.H. cannot do are writing in longhand and understanding money. Otherwise, he is able to read, print letters, spell, write simple stories, add and subtract numbers over 10, and tell time, and he knows the days of the week and months of the year. (R. 130). Plaintiff indicated that I.H. has almost no physical limitations except for swimming, (R. 131), and he has friends, generally gets along with adults and teachers, and plays team sports. (R. 132). Though I.H. does not accept criticism or correction well, he can otherwise take care of his own grooming, clean his room, help around the house, do what he is told most of the time, obey safety rules and get to school on time. (R. 133). Plaintiff finally stated that I.H. is able to keep himself busy,

finish things he starts and complete his homework, but he cannot work on arts and crafts projects or complete chores most of the time.  (R. 134).

At the July 27, 2011 hearing before the ALJ, Plaintiff testified that I.H.'s school had tried to place him in regular classes in the fall of his second grade year, but that he "started having more and more outbursts."  (R. 42).  He thus returned to the self-contained classroom and only attends some regular classes with an aide.  This added support is not always successful, however, as at least twice a week I.H. gets distracted, fidgets, makes "all kind of noises," then "start[s] getting louder, disrupting class" and moving his chair.  (*Id.*).  If he has not calmed down by the time he returns to the self-contained classroom, he "destroys . . . the room" and then has to "put the room back together."  (*Id.*).  I.H. was allowed to move on to the third grade despite borderline grades, caused by his missing so much time in the classroom due to detention.  (R. 43). Plaintiff can sometimes calm him down over the phone, or he can be redirected by the school staff, but other times he screams and hollers for 20 to 30 minutes and has to be sent home.  (R. 49-50).

Plaintiff stated that the Focalin "settles [I.H.] down quite a bit," but his "personalities flare up" towards the end of the school day "when it starts wearing off." (R. 43-44).  He tries to act out at home, but Plaintiff is "so authoritative, that he does not really get by with me as much as he does with the people at school."  (R. 44).  I.H. can dress himself, (R. 45), and he gets along well with the coaches and kids on his basketball team, with no reported outbursts.  (R. 46-47).  He also gets along with his brothers and friends, though he is "the complainer of the group."  (R. 48).  Plaintiff described I.H. as a "Dr. Jekyll/Mr. Hyde" because he can be very polite and courteous

at times but then will yell and scream and call people names. (R. 48-49). I.H.'s only real physical problem is constipation, which occurs because he does not like to go to the bathroom. (R. 45-46).

## C.     I.H.'s Testimony

At the time of the hearing, I.H. was 8 years old and preparing to start third grade in the fall. (R. 34). He testified that he likes math and reading and plays on a basketball team. (R. 34-35). Though he gets along with his teachers at school and can ask for help when he needs it, some of the kids in his class "get on [his] nerves" by wrestling with him or calling him names. (R. 35-36, 39). This makes him angry and "start throwing chairs and stuff," resulting in the school sending him home for the day. (R. 36-37). I.H. said that he tries taking deep breaths to calm himself down, but it does not work. (R. 38). The medications help "sort of" but make him hungry. (R. 35). At home, I.H. said he can pick out his clothes, groom himself, play games, take care of his dogs, clean his room, and take out the garbage. (R. 39-40). He also gets along well with his brothers and friends, does homework if it is not too hard, and goes to church. (R. 39-41).

## D.     The ALJ's Decision

The ALJ found that I.H. is a school-age child who has not engaged in any substantial gainful activity since he applied for benefits on September 19, 2009. (R. 20). I.H. has ADHD and intermittent explosive disorder, but neither of these severe impairments meets or equals those in the listings. (R. 20-21). The ALJ concluded that I.H. likewise does not have an impairment or combination of impairments that functionally equals the listings because despite having a marked limitation in the domain

of interacting and relating with others, (R. 23-24), he has less than marked limitations or no limitations in all other domains of functioning. Specifically, I.H. has (1) less than marked limitations in the domains of: acquiring and using information; attending and completing tasks; and caring for yourself (R. 22-23, 25); and (2) no limitations in the domains of moving about and manipulating objects, and health and physical well-being. (R. 24-25).

In reaching this decision, the ALJ explained that I.H. is at an appropriate third-grade level in school, and his special education teachers reported no problems in the domain of acquiring and using information in November 2009 (Ms. Caponigri) and May 2010 (Ms. Roesch). (R. 22-23). Ms. Caponigri indicated that I.H. has difficulty completing tasks on a day-to-day basis and obvious problems sustaining attention and focusing long enough to finish assigned activities, but the medications he takes have provided "reasonably good results" in that regard, and Ms. Roesch stated in May 2010 that he rarely needs assistance from the aide in class. (R. 23). There is no indication in the record that I.H. has any fine or gross motor deficits, and Plaintiff indicated in the October 5, 2009 Function Report and at the July 27, 2011 hearing that her son can walk, run, throw a ball, jump rope, ride a bike, roller skate, use scissors and video game controls, do karate, and play tennis and basketball. (R. 24-25, 131).

The ALJ noted that despite I.H.'s problems with encopresis, he was responding well to treatment and Ms. Caponigri said that he was seldom absent from school due to illness. (R. 25). In addition, I.H.'s mother confirmed that he can bathe and dress independently, pick up his toys, hang up clothes, and help around the house, "albeit with reminders to do household chores." (*Id*.). The ALJ characterized I.H.'s behavior as

his "most debilitating problem," resulting in a hospital admission in March 2009 and difficulties at school. (R. 23-24). I.H. received therapy and medication to help decrease his disruptive behaviors, and by March 2011, Dr. Abbas reported fewer outbursts and Plaintiff "noticed a significant improvement in his mood with an increase in the Abilify dosage." (R. 24). Based on these findings, the ALJ found that I.H. has not been disabled since September 19, 2009. (R. 25).

## DISCUSSION

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a

remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Framework for Child SSI Benefits

A child is disabled within the meaning of the Social Security Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).  In determining whether a child meets this definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then his claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then his claim is denied; and (3) the child's impairments must meet, medically equal, or be functionally equal to any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1., 20 C.F.R. § 416.924(b)-(d).  *See also Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007).

To determine whether an impairment functionally equals a listing, the ALJ must assess its severity in six age-appropriate categories: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  Each domain describes what a child should be able to do throughout five age categories:  (1) "newborns and young infants" (birth to age 1); (2) "older infants and toddlers" (age 1 to age 3); (3) "preschool children" (age 3 to age 6, including children in kindergarten but not first grade); (4) "school-age children" (age 6 to age 12, including children in first grade through middle school); and

(5) "adolescents" (age 12 to age 18).  20 C.F.R. § 416.926a(g)(2), (h)(2), (i)(2), (j)(2), (k)(2), (l)(2).

An impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.  The functional equivalence analysis requires the ALJ to consider how the child functions as a whole.  "[T]his consists of looking at all of the child's activities, which include everything the child does at home, at school, and in h[is] community, and evaluating how the child is limited or restricted in those activities, without cabining the child's impairments into any particular domain."  *Bielefeldt ex rel. Wheelock*, No. 09 C 50302, 2011 WL 3360013, at *4 (N.D. Ill. Aug. 4, 2011) (citing 20 C.F.R. § 416.926a(b)-(c)).

## C.    Analysis

Plaintiff argues that this case should be reversed or remanded because the ALJ (1) failed to explain why I.H. does not meet or equal Listings 112.04 and 112.11 relating to mood disorders and ADHD; (2) ignored and/or improperly weighed opinion evidence and other medical findings; (3) failed to fully and fairly develop the record; and (4) used improper boilerplate language in making her credibility determination.

### 1.    Listings 112.04 and 112.11

In her opening brief, Plaintiff devotes more than two pages to a recitation of the requirements necessary to meet or equal Listings 112.04 and 112.11.  (Doc. 20, at 5-7).  She then states, without further explanation, that "[t]he medical evidence clearly establishes that [I.H.] meets the criteria."  (*Id.* at 8).  Plaintiff does not indicate which of the criteria I.H. purportedly satisfies for each Listing, nor does she develop any argument or analysis in that regard.  In addition, her reply brief fails to even mention the

Listings, much less respond to Defendant's arguments for upholding the ALJ's findings on that issue. (Doc. 25). The Seventh Circuit has "repeatedly . . . made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). *See also Moss v. Astrue*, No. 09-1196, 2010 WL 2572040, at *5 (C.D. Ill. June 22, 2010) (same). On the record presented, Plaintiff has not met her "burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. 2009).

Plaintiff cannot overcome this deficiency by observing that the ALJ did not specifically mention Listings 112.04 or 112.11 in her decision. (Doc. 20, at 9). Though such an omission "*may* require a remand" in appropriate circumstances, it is not necessary here. *Mogg v. Astrue*, 266 Fed. Appx. 470, 471 (7th Cir. 2008) (emphasis in original). This is because Dr. Jackson and Dr. Henson both concluded that I.H.'s ADHD and adjustment disorder do not meet or equal any listing, and Plaintiff points to no contrary medical authority in the record. (R. 315, 349). The ALJ reasonably afforded some weight to these unchallenged opinions, (R. 22), and the Court sees no basis for remanding the case for further consideration of this issue. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)) (an ALJ "may properly rely upon the opinion of [state agency] medical experts" in determining whether the plaintiff meets or equals a listing); *Jones v. Colvin*, No. 09 C 7645, 2013 WL 1407779, at *10 (N.D. Ill. Apr. 8, 2013) (ALJ reasonably relied on opinions from state agency reviewing physicians that the plaintiff's condition did not meet or equal any listed impairment).

###### 2.    Discussion of Opinion and Medical Evidence

Plaintiff next argues that the ALJ improperly ignored significant evidence in determining that I.H. does not functionally equal a listing.  Plaintiff does not provide an analysis of each domain, so the Court focuses on the three areas mentioned in her brief.[7]

###### a.    Attending and Completing Tasks

The domain of attending and completing tasks considers "how well the child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them."  *Hopgood ex rel. L.G.*, 578 F.3d at 700-01 (citing 20 C.F.R. § 416.926a(h)).  Preschool children (age 3 to 6) should be able to pay attention when spoken to directly, sustain attention while playing and engaging in learning activities, and concentrate on activities like putting puzzles together.  They should also be able to dress and feed themselves, put their toys away, wait their turn, and change activities when a caregiver or teacher says it is time to do something else.  20 C.F.R. § 416.926a(h)(2)(iii).  School-age children (age 6 to 12) should be able to focus attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments.  They should also be able to concentrate on details, not make careless mistakes in their work beyond those of children without impairments, change activities or routines without distracting themselves or others, and stay on task and in place when appropriate.  Finally, school-

---

[7]    Plaintiff makes no argument that I.H. has marked or extreme limitations in the domains of acquiring and using information, moving about and manipulating objects, or caring for yourself, and the Court agrees with Defendant that the evidence reflects either no or less than marked limitations in each of these areas.  (Doc. 24, at 5 n.3) (citing R. 317-18, 351-52, 378-80).

age children should be able to sustain attention well enough to participate in group sports, read by themselves, complete family chores, and complete transition tasks such as changing clothes after gym and changing classrooms.    20 C.F.R. § 416.926a(h)(2)(iv).

The ALJ found that I.H. has less than marked limitation in this domain, noting that he has received "reasonably good results" from his medications.  (R. 23).  Citing to Exhibit 4E, the ALJ discussed a report from I.H.'s teacher indicating that he has difficulty completing tasks on a day-to-day basis, as well as an obvious problem sustaining attention and focusing long enough to finish assigned activities, and refocusing to task when necessary.  (*Id.*).  This is consistent with Ms. Caponigri's November 23, 2009 Teacher Questionnaire to that effect, found at Exhibit 4E.  (R. 150).  The ALJ also addressed Dr. Rubens' January 2010 Psychiatric Evaluation, reflecting (1) Plaintiff's report that she had taken her son off his medications in November 2009 (R. 23, 311); and (2) Dr. Rubens' observation that during the examination, I.H. was cooperative but distracted, with poor attention and concentration.  (R. 23, 312-13).

The ALJ next noted that I.H. started seeing Dr. Taylor-Crawford on February 17, 2010, (R. 23), and it is undisputed that she put him back on medication at that time.  (R. 348).  When I.H. saw Dr. Taylor-Crawford again on April 14, 2010, he had difficulty remaining seated and was distractible, but Plaintiff said that with the medications, her son had been waiting his turn to speak and getting along better with other children at school.  (R. 23, 328).  The ALJ further observed that the following month, in May 2010, Ms. Roesch similarly indicated that since I.H. had started taking medication, he "rarely

needs assistance" from his one-on-one aide at school and only works with him about 2 times per week. (R. 23, 177).

Plaintiff objects that in making this assessment, the ALJ did not fairly consider "the treating doctor's findings that [I.H.] was easily distracted, impulsive, and unable to sit still." (Doc. 20, at 9) (citing R. 283-84). Ignoring the ALJ's discussion of these very findings from Dr. Rubens and Dr. Taylor-Crawford, (R. 23), Plaintiff cites generally to: (1) a March 23, 2009 hospital admission assessment from Dr. Benson, which reported that I.H.'s concentration was "adequate" (R. 271)[8]; and (2) a May 15, 2009 note from Dr. Munoz describing I.H. as impatient with a diagnosis of ADHD following his release from Hartgrove hospital. (R. 284). The ALJ did not mention these particular notes, but she did acknowledge I.H.'s hospitalization in March 2009 and diagnosis of ADHD with hyperactivity. (R. 24). Significantly, Plaintiff does not explain how either note reflects marked limitation in attention and concentration. *See McDonald v. Astrue*, 858 F. Supp. 2d 927, 935 (N.D. Ill. 2012) ("[T]he ALJ need not discuss every piece of evidence in the record" as long as she builds "an accurate and logical bridge from the evidence to her conclusion.") (internal quotations omitted).

Plaintiff next claims that the ALJ erred in failing to "discuss[] or comment[] on" the Childhood Disability Evaluation reports from Dr. Jackson (dated February 2010) and from Dr. Henson (dated June 2010). (Doc. 20, at 9) (citing R. 320, 349).[9] As noted

---

[8]  Plaintiff's brief actually cites to R. 307, but this is clearly an error as that page is part of a pre-printed medical records release form. Notably, practically every single record citation found throughout Plaintiff's brief is incorrect, making it extremely difficult to assess the accuracy of her factual statements and related legal arguments.

[9]  Plaintiff mistakenly indicates that an unspecified "psychiatric evaluation" of I.H. occurred on "10/19/09." (Doc. 20, at 9). There is no record of any exam on that date, and the page Plaintiff cites to is from Dr. Jackson's February 11, 2010 Childhood Disability Evaluation. (R. 320). Counsel is cautioned to take greater care with record citations in the future.

earlier, however, the ALJ acknowledged both reports and assigned some weight to the doctors' findings that I.H. is not disabled. (R. 22, 315, 349). Moreover, Dr. Jackson and Dr. Henson both concluded that I.H. has less than marked limitations in the domain of attending and completing tasks, which is exactly what the ALJ found here. (R. 23, 317, 351). As a result, there is no merit to Plaintiff's argument that the ALJ "relied upon her own inexpert opinion and stated without support, that [I.H.] only had a mild impairment in maintaining attention and concentration." (Doc. 20, at 9). *Cf. Brennan-Kenyon v. Barnhart*, 252 F. Supp. 2d 681, 691 (N.D. Ill. Mar. 20, 2003) (citing *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996)) ("[A]n ALJ may not play doctor and substitute his own opinion for that of a physician.").

Later in her brief and in a subsequent reply, Plaintiff changes course and argues that the ALJ should not have relied on the opinions from Dr. Jackson and Dr. Henson at all. She first objects that they consist of "little more than checks on a pre-printed form." (Doc. 20, at 12). This is inaccurate, as both reports include written narratives explaining each finding. (R. 317-20, 351-54). Moreover, even though neither Dr. Jackson nor Dr. Henson examined I.H., "[i]t is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)).

Plaintiff does not dispute this proposition, but says the opinions at issue here were "unavoidably incomplete," noting that "[b]y 2012, [they were] almost two years

old."[10]  (Doc. 20, at 12; Doc. 25, at 3).  This time lapse is problematic, Plaintiff posits, because there were more recent treatment notes available from the "team of doctors from the University of Illinois at Chicago," all of which she says the ALJ improperly "cast[] aside."  (Doc. 25, at 3; Doc. 20, at 12-13).  The mere fact that the state agency opinions date to June 2010 does not alone establish that the ALJ erred in relying on them.  That said, the ALJ's decision to weigh them more heavily than the opinions from I.H.'s treating physicians requires close examination.

A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010).  An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist.  20 C.F.R. § 404.1527(c)(2)-(5).  *See, e.g.*, *Simila*, 573 F.3d at 515.

Dr. Abbas opined in March 2011 that I.H. is markedly limited in attending and completing tasks, explaining that he has bipolar disorder and ADHD, he "loses focus and attention," and he is "distractible, hyperactive and impulsive."  (R. 378).  The ALJ

---

[10]     It is unclear why Plaintiff uses the year 2012 as a benchmark given that the ALJ issued her decision in September 2011, less than 16 months after Dr. Henson affirmed Dr. Jackson's assessment in June 2010.

offered two reasons for rejecting this opinion: (1) Dr. Abbas "indicated [I.H.] was disabled even before he was born"; and (2) the opinion "is not supported by the rest of the record as set forth below." (R. 22). The first explanation is easily dismissed. Though Dr. Abbas did mistakenly state that she had been treating I.H. since January 2001, she also said that her first contact with him was on "1/31/11." (R. 378). The Court agrees with Plaintiff that this scrivener's error does not justify rejecting Dr. Abbas' opinion.

The second explanation is also problematic because in discussing the domain of attending and completing tasks, the ALJ's recitation of the "record as set forth below" stops in mid-May 2010. Though the ALJ mentioned treatment notes from Dr. Taylor-Crawford from February and April 2010, she did not acknowledge or address any of the doctor's subsequent notes from May 12 through December 8, 2010. Defendant is correct that the December 8, 2010 note reported that I.H. was spending more time in the regular classroom and demonstrated improved concentration with Focalin, (R. 444), but the ALJ did not cite this as a reason for rejecting Dr. Abbas' opinion. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Given that I.H. was subsequently transferred to a bipolar study and diagnosed with bipolar disorder, moreover, it is not clear that the cited improvement in concentration is necessarily inconsistent with a finding of marked limitation in attending and completing tasks. Notably, the ALJ's decision said nothing about the bipolar diagnosis, or Plaintiff's testimony that I.H. actually had been moved back to a self-contained classroom in

January 2011 and needed an aide for any regular classes because he "gets distracted . . . starts fidgeting, making all kind of noises . . . and disrupting the class." (R. 42).

In addition, the ALJ ignored treatment notes from another UIC physician, Dr. Kezlarian, who described I.H. as restless and fidgety with tangential thought process in February and March 2011. (R. 425, 468-69). The ALJ did not indicate what weight, if any, she gave to this treating assessment or, for that matter, to the evaluations from Dr. Taylor-Crawford. *See Ulloa v. Barnhart*, 419 F. Supp. 2d 1027, 1037 (N.D. Ill. 2006) ("Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of claimant's treating physicians."). In discussing the separate domain of interacting and relating with others, the ALJ did state that I.H. "also had additional treatment at the University of Illinois," but she then merely cited to "Exhibits 12F – 15F," consisting of more than 100 pages of UIC records. (R. 24). The Court cannot determine from such a broad and generic citation whether the ALJ adequately considered this evidence, or built an accurate and logical bridge between it and her conclusions. The ALJ also discussed notes from Dr. Abbas dated March and April 2011, but only in the context of I.H.'s behavior and mood problems without mention of his ability to concentrate and focus. (*Id.*). Once again, there is no logical bridge between this evidence and the ALJ's finding of mild impairment of concentration.

In light of these deficiencies, the Court cannot uphold the ALJ's decision to reject Dr. Abbas' opinion in favor of the assessments from the state agency physicians. The determination that I.H. has only mild limitation in attending and completing tasks is not

supported by substantial evidence and requires that the case be remanded for further consideration.[11]

### b. Interacting and Relating with Others

To assist the ALJ on remand, the Court will continue its analysis of Plaintiff's other arguments. The domain of interacting and relating with others considers how well a child is able to develop and use language, comply with rules and respond to criticism. A preschool-age child (age 3 to 6) should start to make friends, play cooperatively with other children, and "be better able to share, show affection, and offer to help." 20 C.F.R. § 416.926a(i)(2)(iii). A school-age child should be able to develop more lasting friendships, work in groups, and have "an increasing ability to understand another's point of view and to tolerate differences." The child should also be able to "talk to people of all ages, to share ideas, [and] tell stories." 20 C.F.R. § 416.926a(i)(2)(iv).

The ALJ found that I.H. is markedly limited in this domain, describing his behavior as "his most debilitating problem." (R. 23). In reaching this conclusion, the ALJ expressly recounted I.H.'s problems at school, his low frustration tolerance and poor impulse control necessitating placement in a self-contained classroom, his hospitalization in 2009, his diagnosis of intermittent explosive disorder and ADHD with hyperactivity, his need for individual and family therapy sessions, and his problems with anger in May 2010 requiring "restraint . . . once or twice a week in class." (R. 24). The ALJ also discussed I.H.'s treatment at UIC, including notes from Dr. Abbas from March

---

[11] There is no merit to Plaintiff's additional argument that the case must be remanded because the ALJ failed to mention I.H.'s GAF/CGAS scores. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (neither the Social Security Regulations nor the case law "require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."). That said, the ALJ may want to take the opportunity on remand to consider whether those scores, which at various times reflected moderate to major impairment, shed light on the treating physician opinions in this case.

and April 2011 indicating that he was having fewer outbursts, was not as angry or aggressive, and exhibited an improved mood. (*Id.*).

Plaintiff claims that the ALJ improperly decided that I.H. "did not have an extreme impairment in interacting and relating to others" without referring to "any expert or treating source." (Doc. 20, at 11). To the contrary, Dr. Jackson, Dr. Henson, and Dr. Abbas all agreed that I.H. is markedly limited in this domain, and Plaintiff does not identify any physician who found greater impairment. (R. 317, 351, 379). Plaintiff objects that the ALJ failed to appreciate reports from I.H.'s teachers indicating that while he did perform better in a self-contained classroom, he "needs to be physically restrained due to anger a number of times a day, checking the box for an extreme or marked impairment." (Doc. 20, at 11). The record citations Plaintiff provides are inaccurate, but she appears to be referring to Ms. Caponigri's November 2009 report that I.H. had a very serious problem expressing anger appropriately, following rules and respecting/obeying adults. (R. 151). Yet the ALJ expressly acknowledged this assessment, noting that I.H.'s "teacher reported that he gets very angry when he does not get his way," and that he needed to be placed in a self-contained classroom. (R. 24) (citing Exhibit 4E which includes Ms. Caponigri's report). Regardless, school reports cannot trump the medical findings from Dr. Jackson, Dr. Henson, and Dr. Abbas. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A] teacher's description of a child's daily behavior [does not] qualif[y] as medical evidence.").

Plaintiff also claims that the ALJ ignored "IEP findings in 2010 that even though [I.H.] exhibited some improvement . . . his angry outbursts and violent behavior were frequent and severe." (Doc. 20, at 11) (citing R. 236, 253-55). Only one of the cited

records relates to I.H.'s IEP, and that page merely indicates that with respect to certain classes, the school was going to "monitor [I.H.'s] focus inline getting to class, or turning in his homework," and "[m]onitor safe behavior and correct behaviors in the bathroom." (R. 236). The other cited pages are from I.H.'s March 2009 hospitalization. (R. 253-55). Plaintiff offers no explanation for how any of this evidence demonstrates that I.H. has an extreme limitation in the domain of interacting and relating with others. Indeed, as noted, the ALJ's finding of marked limitation in this domain is consistent with all physician opinions of record. It is thus supported by substantial evidence.

### c. Health and Physical Well-Being

The domain of health and physical well-being considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [a child's] functioning." 20 C.F.R. § 416.926a(l). The ALJ concluded that I.H. has no limitations in this domain, noting that despite having "problems with encopresis," he "responded well to treatment" with only "short lived" side effects from medication. (R. 25). Dr. Jackson and Dr. Henson likewise found no limitations in this domain, describing I.H.'s development to be "age appropriate." (R. 318, 352). The only contrary opinion is from Dr. Abbas, who found I.H. markedly limited in this area because he is "overweight." (R. 380). The ALJ reasonably assigned this opinion little weight, however, since it is not supported by the record evidence. (R. 22). Dr. Abbas provided no explanation as to how I.H.'s health and physical well-being have been impaired by the excess weight. Moreover, Plaintiff reported in October 2009 that her son can "walk, run, throw a ball, jump rope, ride a bike, roller skate, use scissors, . . . use video game controls," and obey safety rules. (R. 25, 131, 133). I.H. testified at the July 2011

hearing that he likes playing on a basketball team, (R. 35), and said he can pick out his clothes, groom himself, play games, take care of his dogs, clean his room, and take out the garbage. (R. 39-40). Plaintiff agreed that with respect to basketball, I.H. did "most of the exercises, and he made the games, and he was really excited." (R. 46).

On the record presented, there is no evidence that I.H. has any limitation in the domain of health and well-being, much less a marked or extreme limitation. The ALJ's finding in this regard is supported by substantial evidence and does not justify reversal or remand.

### 3.    Duty to Develop the Record

Plaintiff next claims that the ALJ did not develop a full and fair record in this case. This argument is difficult to decipher. Plaintiff begins by citing general case law relating to residual functional capacity ("RFC") assessments, which have no bearing on this child SSI case involving a 9-year-old boy who has never worked. (Doc. 20, at 13-14). *See, e.g., Marcus v. Bowen*, 696 F. Supp. 364, 381 (N.D. Ill. 1988) ("The parties recognize that the Secretary evaluates wage earner claimants differently than children" in that "the Secretary determines the wage earner's RFC."). Plaintiff then claims that the ALJ failed to "develop[] the proper medical reports." (Doc. 20, at 13-14). Citing the ALJ's "obligation to seek more evidence," Plaintiff suggests that the ALJ should have ordered "further medical examination" of I.H. prior to making her decision. (*Id.* at 14-15). As Defendant notes, however, Plaintiff has not indicated what evidence is missing from the record, or how it would change the ALJ's finding in this case. (Doc. 24, at 14-15).

The Seventh Circuit "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). To succeed in arguing that an ALJ failed to develop the record fully and fairly, a plaintiff must show a "significant omission" prejudiced her case. *Id.* (citing *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) and *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997)). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Id.* Here, Plaintiff does not identify any gaps in the medical record or allege that the ALJ failed to elicit any specific evidence at the hearing or otherwise. Indeed, in her reply brief, Plaintiff says that she in fact "did not argue that the ALJ should have obtained some updated medical evidence." (Doc. 25, at 6). Plaintiff's request for remand based on the ALJ's failure to adequately develop the record is denied.

### 4.    Credibility Determination

Plaintiff finally objects to the ALJ's use of the boilerplate credibility language the Seventh Circuit has repeatedly criticized as "unhelpful" and "meaningless." (Doc. 20, at 8-9) (citing *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)). Oddly, she claims that the ALJ used this language "when assessing whether [I.H.] met or equaled the listings," (Doc. 20, at 8), which is simply wrong. (R. 23). In any event, the use of the boilerplate template does not alone provide a basis for remand. *See, e.g., Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (the boilerplate language is "inadequate, by itself, to support a credibility finding," but decision affirmed where "the ALJ said more."). When Defendant pointed this out, Plaintiff responded that she was actually challenging the "incredible dearth of explanation as to the findings of the ALJ."

(Doc. 25, at 6). She offers no explanation as to what this has to do with the ALJ's credibility finding or the use of boilerplate credibility language. In fact, the only other argument Plaintiff makes in that regard is the generic assertion that the ALJ "ignored the credible testimony of the claimant and his mother." (Doc. 20, at 8). As noted earlier, such undeveloped arguments cannot support summary judgment. *Berkowitz*, 927 F.2d at 1384.

Nevertheless, on remand, the ALJ should more clearly articulate the weight she assigns to the testimony from both Plaintiff and I.H., and provide a more thorough analysis of those credibility findings.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 19) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: January 10, 2014

SHEILA FINNEGAN
United States Magistrate Judge